UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN JERAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 05 C 6020 |
| v. | ) |
| | ) Judge George M. Marovich |
| JO ANNE B. BARNHART, COMMISSIONER | ) |
| OF THE SOCIAL SECURITY ADMIN., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Steven Jeras ("Jeras") filed this action to appeal a final administrative decision denying his application for disability benefits under the Social Security Act. Plaintiff and defendant have filed cross-motions for summary judgment on the administrative record. For the reasons set out below, the Court denies the plaintiff's motion for summary judgment and grants defendant's motion for summary judgment.

**I.  Background**

On or about January 12, 2000, plaintiff Jeras applied for Social Security disability benefits. (R. 56). At the time of his application, Jeras was 41 years old. (R. 56). In his application, Jeras stated that he "became unable to work because of [his] disabling condition on January 5, 1998." (R. 56). Prior to the time Jeras applied for disability benefits, he had worked as a machinist (1976-1982), in research and engineering (1982-1992) and in light manufacturing (1996-1998). (R. 78, 216-218). Jeras is a high school graduate. (R. 83).

The administrative record contains, among other things, Jeras's medical records for a period of time before Jeras filed for disability benefits. For example, in July 1996, Jeras met with Dr. Thomas J. Pozen ("Dr. Pozen") regarding his back. Jeras reported that he had had

lumbar disk surgery about fifteen years earlier. (R. 198). Jeras informed Dr. Pozen that he had fully recovered but that he had experienced about six occurrences of back spasms in each of the prior three years. (R. 198). Jeras consulted Dr. Pozen again in September and October of 1996 for his back pain. (R. 197). Dr. Pozen prescribed Lortab and Votarin. (R. 197). Jeras saw Dr. Pozen again on or about March 15, 1997. (R. 196). At the time, Jeras complained that he had had worsening back pain off and on for the last two months. (R. 196). Jeras reported to Dr. Pozen that some pain had radiated to both buttocks and the left leg. (R. 196). Jeras also reported experiencing tenderness and spasms in the lumbar area. (R. 196). In September 1997, Jeras reported to Dr. Pozen that he had consulted another doctor (there are no records in the administrative record to clarify who this doctor may have been) about back pain. (R. 196). Jeras asked Dr. Pozen to write him a note stating that he could not stand for more than 4-5 hours per day. (R. 196). Dr. Pozen wrote Jeras a note saying that Jeras was advised not to stand continuously for more than 4-5 hours. (R. 167). He also wrote Jeras an excuse from work for the period of September 25, 1997 to October 6, 1997. (R. 167).

According to Jeras's testimony, at some point in 1998 and/or 1999, his back was treated with cortisone injections. (R. 224).

In March 1999, before Jeras applied for disability benefits, he was treated by Dr. Scott Glaser, M.D. ("Dr. Glaser") at Hinsdale Hospital for shoulder pain. Dr. Glazer noted:

> This patient's history is well documented. He has received injection therapy and is currently receiving medication therapy for his post laminectomy syndrome. Almost two weeks ago, the patient slipped and fell on his left arm and has had left shoulder and arm pain since then. The pain is located on the inner aspect of his arm and runs down the inner aspect of his forearm into his first and half of his fourth finger. . . .
> This patient is suffering from radicular upper extremity pain which has improved substantially since the original incident. I do not see any need for diagnostic tests

at this time. He used to take these same medications that he is using for his lower
back and [sic] return to the Pain Management Center on an as needed basis, or if
his symptoms worsen.

(R. 123).

On January 8, 2000, within days of his filing for disability benefits, Jeras met with Dr. Pozen for the first time in more than a year. (R. 195). Jeras denied having depression but stated that he continued to have back pain. (R. 195). Jeras told Dr. Pozen that he was able to stand three hours and walk a mile. (R. 195).

On or about January 9, 2000, Jeras filled out a Disability Report. (R. 76-85). In the report, Jeras stated that he was six feet tall and weighed 200 pounds. (R. 76). Jeras explained that he suffered back problems, which also caused leg pain and numbness. (R. 77). He attributed his back problems to an incident in 1982 (when he had back surgery). (R. 77). In addition, he stated that he had fallen and injured his head in January 1998 and that the injury caused him to reduce his work hours and caused him to be terminated from the job he held at that time. (R. 77). At the time Jeras filled out the report, he stated that he was taking Oxycontin and Lortab for pain, a muscle relaxer and an anti-inflamatory drug. (R. 82). He was asked to report side effects of those drugs, and he reported none. (R. 82).

On January 10, 2000, Jeras again met with Dr. Glazer at Hinsdale Hospital, ostensibly because he was running out of medication due to a lost bottle. (R. 128-129). Dr. Glazer noted:

> As far as his lower back pain, he is able to perform activities of daily living. He
> can stand for three hours and walk without a problem. His current home
> medications are oxycontin 60 mg in the morning and 80 mg at night and Lortab,
> up to four per day. He is not noting any side effects from his oral narcotics.

(R. 129).

The Illinois Department of Rehabilitation Services asked Dr. Glazer for a disability statement with respect to Jeras. (R. 131). Dr. Glazer responded on February 1, 2000 that it was "the policy of our department not to do disability evaluations." (R. 131).

Dr. Thomas Rogers, M.D. ("Dr. Rogers") evaluated Jeras on February 28, 2000. (R. 132-133). Dr. Rogers diagnosed Jeras with chronic back pain and, more specifically, post-laminectomy syndrome. (R. 132). Dr. Rogers noted that Jeras experienced lumbar and thigh pain and numbness in his toes. (R. 132). Dr. Rogers noted that Jeras could not sit for longer than two continuous hours and could not lift more than ten pounds. (R. 133).

In early March 2000, Jeras reported to the Social Security Administration that he was traveling to San Antonio, Texas in an attempt to find a job. Later in the month, he reported to the SSA that he had received several job offers and was going to discuss with his wife a possible move to San Antonio. (R. 86). On or about April 28, 2000, Jeras told the SSA that he felt that his disability was due to his back problems, not psychological factors. Jeras reported that while he had felt anxious about his back surgery, he was feeling fine and he did not feel that his anxiety was disabling. (R. 88). He reported that he was able to take care of his daily activities, such as shopping and paying bills. (R. 88).

On or about April 14, 2000, Dr. V.G. Motiani, M.D. ("Dr. Motiani") evaluated Jeras. (R. 134-135). By this time, Jeras weighed 219 pounds. (R. 135). Dr. Motiani noted that Jeras had had back surgery in 1982 and that he had felt good for about ten years when he began suffering discomfort in his back and upper legs. (R. 134). Jeras informed the doctor that he was experiencing level two pain constantly and that the pain sometimes elevated to a 4 or 6. (R. 134). Jeras told the doctor he could walk a couple of miles, stand for a couple of hours and sit;

he had no problems lying down. (R. 134). Jeras told Dr. Motiani that he experienced numbness in his toes, and Dr. Motiani noted that Jeras had diminished perception of pinpricks to his toes. (R. 135, 136). Dr. Motiani noted that Jeras "has a full range of movement," could "get up from a laying down position without much difficulty," and had "a full range of movement" in his spine. (R. 135, 136). The doctor recognized that Jeras experienced back tenderness and muscle spasms. (R. 135).

Days later, on April 18, 2000, Jeras met with Dr. Richard Koenig, M.D. ("Dr. Koenig"), a psychiatrist. (R. 137-138). Jeras described to Dr. Koenig his typical day, which involved getting up at 6:00, showering, taking the dog for a half-hour walk, walking two miles, and reading the newspaper. (R. 137). Jeras told Dr. Koenig that he could not sit or stand for long periods of time without suffering back spasms. (R. 137).

On or about May 9, 2000, Jeras met with Dr. Henry S. Bernet, M.D. ("Dr. Bernet") for a functional capacity evaluation. Dr. Bernet concluded that Jeras could occasionally lift 20 pounds, frequently lift ten pounds, stand or walk for six hours of an eight-hour day, sit for six hours of an eight-hour day and was unlimited with respect to pushing and pulling. (R. 140). Dr. Bernet found no postural limitations except that Jeras should never climb ropes or ladders and should climb stairs only occasionally. (R. 141). Dr. Bernet found no manipulative, visual, communicative or environmental limitations. (R. 142-142). Finally, Dr. Bernet noted a decreased range of motion and decreased perception to pinpricks in Jeras's toes. (R. 146). At about the same time, Dr. Bernet filled out a Disabilty Determination form and noted that while claimant had a back disorder and an anxiety disorder, he was not disabled.

In early May 2000, Dr. John Tomassetti, Ph. D ("Dr. Tomassetti") evaluated Jeras with respect to his anxiety. (R. 147-155). Dr. Tomassetti concluded that Jeras did not suffer a severe psychological impairment. (R. 147). Dr. Tomassetti noted that Jeras was improved and had anxiety only with respect to certain situations. (R. 151). Dr. Tomassetti found no restrictions or limitations with respect to daily living, maintaining social functioning or concentrating. (R. 154).

On or about May 23, 2000, the Social Security Administration ("SSA") informed Jeras by letter that it had concluded that his "condition was not disabling on any date through 9/30/99, when [he was] last insured for disability benefits." (R. 39).

In late October 2000, Jeras again met with Dr. Pozen. (R. 192). Jeras told the doctor that he continued to suffer from back pain. (R. 192). Jeras reported that he felt less anxious and that he was considering moving to Texas for a job opportunity. (R. 192). Jeras also told Dr. Pozen that he walked one to two miles per day. (R. 192).

On or about December 1, 2000, Jeras filled out another Disability Report form. (R. 90-99). By this time, Jeras reported his weight as 217 pounds. (R. 90). Jeras stated that he could not stand or sit for more than one hour without severe pain and more than three hours without suffering back spasms. (R. 91). In this report, Jeras described the side effects of his medication. He stated that his Oxycontin and a new anxiety drug caused minimal sleepiness. (R. 96). Jeras stated that his other medications (Lortab, Soma and Votarin) caused no side effects. (R. 96).

In March 2001, Jeras filled out a disability form in which he stated that he seemed to be moving more slowly and having more difficulty with groceries. (R. 108-109). He stated that he was experiencing painful "shots" down his leg more often that he used to. (R. 108).

In April 2001, the SSA sent Jeras for another functional capacity evaluation. (R. 156-163). The evaluator, Dr. Kim, M.D. ("Dr. Kim") attempted to evaluated Jeras's functional capacity as of September 30, 1999 and concluded that Jeras was "capable of performing light work activity as of his DLI of 9/30/99." (R. 163). Dr. Kim noted that Jeras could occasionally lift 20 pounds, frequently lift ten pounds, stand or walk for six hours of an eight-hour day, sit for six hours of an eight-hour day and was not limited with respect to pushing and pulling. (R. 157). Dr. Kim noted that Jeras could never climb a ladder but could occasionally climb stairs, balance, stoop, crouch or crawl and could frequently kneel. (R. 158). Dr. Kim found no manipulative, visual, communicative or environmental limitations. (R. 159-160).

On or about May 1, 2001, the Social Security Administration once again concluded that Jeras had not been disabled as of September 30, 1999. (R. 46). The SSA informed Jeras:

> The medical evidence in file shows that your condition did cause some restrictions in your ability to function. However, you still had the ability to do light work. We realize that your condition prevented you from doing your past jobs, but you were still able to do other types of work which are less demanding on or before 09/30/99.

(R. 46).

On or about January 25, 2002, Jeras's attorney sent Jeras to see Dr. Barry Fischer, M.D. ("Dr. Fischer") for an independent medical evaluation. (R. 169-172). By that time, Jeras weighed 230 pounds. (R. 170). Dr. Fischer noted that Jeras had a limited range of motion in his lumbar spine and that Jeras suffered some tenderness and spasms in his lower back. (R. 170). Dr. Fischer also concluded that Jeras had reached a "state of maximum medical improvement" and that his injury "precludes [him] from returning to his prior work activities." (R. 171-172).

On February 28, 2002, someone (it is not clear who or whether the person was a doctor) filled out an Illinois Department of Human Services "Medical Evaluation" for Jeras. (R. 173). That form says that Jeras had a limited range of motion of the lumbar spine and that he met the listing 1.04(A). (R. 173).

On March 4, 2002, Jeras met with Dr. Timothy Tumlin, Ph.D. ("Dr. Tumlin"), a psychologist. Jeras reported to Dr. Tumlin that he was having increased difficulty concentrating and remembering details. Jeras also told Dr. Tumlin that he was experiencing high levels of anxiety and depression, including feelings of helplessness, tearfulness and agitation. (R. 174).

In August 2002, Jeras asked one of his doctors, Dr. Pozen, to fill out a "Residual Functional Capacity Questionnaire." (R. 178-181). Dr. Pozen stated that Jeras suffers "[r]ecurrent daily back pain occ[asionally] involving either leg." (R. 178). Dr. Pozen was asked, "How often during a typical workday is your patient's experience of pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work talks?" and he answered "frequently." (R. 179). When asked, "How many city blocks can your patient walk without rest or severe pain?" Dr. Pozen answered, "one block." (R. 179). Dr. Pozen answered that Jeras could sit for 30 minutes before needing to get up. (R. 179). When asked how long the patient "can sit and stand/walk *total in an 8-hour working day*," Dr. Pozen stated less than two hours. (R. 179). Dr. Pozen said that Jeras needed to take five-minute walking breaks each half hour and would need to take a break from sitting, standing or walking for thirty minutes each hour. (R. 180). According to Dr. Pozen, Jeras was able occasionally to "lift and carry" less than ten pounds but could never lift ten pounds or more. (R. 180). Dr. Pozen was asked, "What is the earliest date that the descriptions of *symptoms and limitations* in

this questionnaire applies?" (R. 181) (emphasis in the original). Dr. Pozen answered, "fall of 1998." (R. 181). Finally, Dr. Jeras answered "no" to the question, "Do emotional factors contribute to the severity of your patient's symptoms and functional limitations?" (R. 179).

**Hearing before the Administrative Law Judge**

Jeras requested a hearing before an administrative law judge ("ALJ"). (R. 49). The hearing was held on September 3, 2002. (R. 209). At the hearing, the ALJ listened to testimony from Jeras and his wife, Michelle Jeras. (R. 215, 229). As of the hearing date, Jeras was 44 years old and weighed 225 pounds. (R. 222, 215). Jeras testified that he had not worked since January 5, 1998. (R. 215-216). The ALJ asked Jeras about "current" medical problems that would interfere with his ability to work. (R. 219). Jeras said, "My back hurts all the time, all the way down into my tailbone and up past, I would say, my belly button height. My left leg hurts. My left buttock hurts. My right buttock hurts. My right leg occasionally. I get – from the mild throbbing pain; I get shots all the way down. It will knock you to the ground if I happen to twist and bend a little bit or to do something funny." (R. 219-220). Jeras stated that his knee and toes were numb. (R. 220). Jeras testified that he could lift ten pounds, though not at arm's length. (R. 222). Jeras said he could stand for about one half hour and sit for about an hour. (R. 221). Jeras testified that he could walk only one block and climb about two flights of stairs. (R. 221-222). Jeras also testified that he wanted the ALJ to consider his anxiety. (R. 220). Jeras told the ALJ that he was "very nervous about the situation with [his] wife" because they wanted to have children but had not, seemingly because he did not have a job. (R. 220).

Jeras testified that he has a prescription brace for his back that he prefers not to wear in public. (R. 230-231). In public, he wears a soft version because it causes him less embarrassment. (R. 231).

Michelle Jeras added that she often has to help Jeras out of chairs. (R. 230). She noted that Jeras is unable to sit through an entire movie. (R. 230).

At the hearing, the ALJ also sought the testimony of a vocational expert, James Breen ("Breen"). (R. 54, 233-238). The ALJ had the following exchange with the vocational expert:

> Q: I'd like to ask you several hypothetical questions involving an individual having the same work experience as you've just summarized for Mr. Jeras and being also the same age of 44 years, and having the same high school education. For the first question, if I were to find that the hypothetical person had the residual functional capacity that was assessed by reviewing State Agency physicians and is in the record as Exhibit 9F, and indicates the ability to do the standing and walking, and lifting required of light work, but would be subject to postural limitations against any climbing of ladders, ropes or stairs, as well as only occasional balancing, stooping, crouching, and crawling, and the reviewing State Agency's physicians also concluded that there was no severe mental impairment. Given these findings, could the hypothetical person return to any past work?
>
> A: No, he wouldn't.
>
> Q: And would there be any skills or semi-skills transferable to other jobs and, if so, could you identify the jobs and their numbers in the economy?
>
> A: Yes, Your Honor. Transferable skills with the two occupations noted were performing a variety of duties, obtaining precise set limits, tolerances and standards and making judgments and decisions. Jobs with transferable skills in the light work category could be that of production line assembly with an SVP level of four, and the work group category of light. Numbers in the Chicago land area were 36,350 . . . He could also do work such as a quality control technician, the SVP level of three and the light work group category, and has – in 1998, 13,801 jobs . . . He could also work as a bench hand doing light assembly work with the jobs number in 1998 1,935 . . .

\* \* \*

> Q: While we were off the record, Mr. Breen, did you have an adequate time to review Dr. Posen's [sic] [functional capacity evaluation]?
>
> A: Yes, Your Honor.
>
> Q: And if that was accepted as an accurate depiction of the hypothetical person's capabilities and limitations, what would be the vocational outlook?
>
> A: He would be unemployable, Your Honor, based on the fact that he would need to take unscheduled breaks during an eight hour working day approximately hourly for approximately 30 minutes at a time. Employers are not going to allow him to do that.

(R. 236-238).

**The ALJ's Decision**

On December 13, 2002, the ALJ issued an opinion denying Jeras's request for disability benefits. (R. 24-29). The ALJ concluded that Jeras was insured for disability benefits through September 30, 1999. (R. 28). The ALJ concluded that Jeras's back impairment was a "severe impairment" within the meaning of the regulations but that it was not equal to any impairment listed in Appendix 1, Subpart P of the regulations. (R. 26). The ALJ concluded that plaintiff's anxiety was not a severe impairment. (R. 26). Based on the functional capacity evaluations and the treatment records from Dr. Pozen (between July 1996 and April 2002), the ALJ concluded that Jeras maintained the functional capacity to perform light work with restrictions against "climbing ladders, ropes, or scaffolds, or more than occasional balancing, stooping, crouching, crawling, or climbing of ramps and stairs." (R. 26). The ALJ noted that "comparing claimant's reports to Dr. Pozen against his testimony of being able to stand only ½ hour comfortably and starting to hurt after walking a block, as well as evaluating that testimony against object evidence and using factors in SSR 96-7p, warrants not fully crediting his testimony." (R. 26).

Relying on the testimony of the vocational expert, who stated that Jeras's previous work had been medium work, the ALJ concluded that Jeras could not return to his prior work. (R. 27). Based on the testimony of the vocational expert, the ALJ also concluded that Jeras "is capable of making a successful adjustment to work that exists in significant numbers in the national economy." (R. 28). Accordingly, the ALJ concluded that Jeras was not disabled. (R. 28, 29).

Jeras filed a request for review with the Appeals Council, which denied his request for review. (R. 5). The ALJ's decision, thus, became the final decision of the Commissioner of Social Security. Jeras filed an action in this Court for review of that decision. Both parties have moved for summary judgment.

## II. **Standards**

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

An individual denied Social Security benefits by the Commissioner of Social Security Administration may seek review at the district court. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" *See* 42 U.S.C. § 405(g). This Court's review is limited to determining whether the ALJ's decision is

"both supported by substantial evidence and based on the proper legal criteria." *Scheck v. Barnhart*, 357 F.3d 697, 698 (7th Cir. 2004). Substantial evidence is that which a reasonable mind would accept as support of a conclusion. *Id.* If the ALJ's decision is supported by substantial evidence, it "will be upheld even if an alternative position is also supported by substantial evidence." *Scheck*, 357 F.3d at 698 (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

## III. Discussion

To qualify for disability benefits under the Social Security Act, one must, among other things, be under a "disability," which is defined under the Act as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months

42 U.S.C. §§ 423(a)(1)(D); 423(d)(1). In determining whether a claimant is disabled, the ALJ must consider whether:

> (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe v. Barnhart*, 425 F.3d 345, 351-352 (7th Cir. 2005) (citing 20 C.F.R. §§ 404.1520, 416.920). The claimant has the burden of proof with respect to steps one through four, and the burden shifts to the Commissioner with respect to step five. *Briscoe*, 425 F.3d at 352. A finding of disability "requires an affirmative answer at either step three or step five." *Briscoe*, 425 F.3d at 352. In considering whether an applicant is disabled, the Social Security Administration

requires "evidence from acceptable medical sources" and lists as the acceptable sources: licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, licensed optometrists, licensed podiatrists and qualified speech language pathologists. *See* 20 C.F.R. § 1513(a).

Here, the ALJ applied the proper legal standard when he considered the five steps set out in the regulations. (R. 24-29). The ALJ concluded that Jeras was insured for disability benefits through September 30, 1999. (R. 28). No party disputes that conclusion. In addition, the ALJ's factual findings are supported by substantial evidence.

*Whether Jeras was employed*

At step one, the ALJ's conclusion that Jeras was not employed was supported by substantial evidence, most notably Jeras's testimony that he had not worked since January 1998. (R. 215-216). The ALJ did not hold against Jerad his efforts to find work in San Antonio, Texas. (R. 86). Jeras does not take issue with the ALJ's conclusion as to step one, and the Court does not disturb it.

*Whether Jeras had a severe impairment listed in the regulations*

At steps two and three, the ALJ considers whether the claimant has a severe impairment and whether it is equal to any impairment listed in the regulations as being so severe as to preclude substantial gainful employment. At steps two and three, the ALJ concluded that Jeras's back impairment was severe but did not meet the listing requirements. The ALJ also concluded that Jeras's anxiety was not a severe impairment.

Substantial evidence supports the ALJ's conclusion that Jeras suffered a severe back impairment but not an impairment so severe as to meet or equal the listed impairments. The

-14-

relevant issue, of course, is whether Jeras's back impairment was severe and met the listing *as of September 1999* not as of September 2002 or some other time. The record is full of consistent physician reports (both Jeras's physicians and physicians hired by the SSA) from early 2000 that state that Jeras suffered back spasms and pain stemming from a 1982 surgery, that the pain sometimes radiated into Jeras's buttocks and legs, that Jeras experienced some numbness in his toes, that Jeras could lift about ten pounds, that Jeras could walk one to two miles and that Jeras could stand for about two hours. (R. 128-129, 132-133, 134-136, 137-138, 141-146, 195). These medical reports are consistent with Jeras's own statements at the time. (R. 76-85, 134, 195).

Jeras argues that the ALJ should have concluded that Jeras met the listing requirements of listing 1.04. That listing requires:

> **1.04** *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> OR
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> OR
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Jeras correctly points out that there is one piece of evidence in the record that supports a finding that Jeras meets the listing requirements of 1.04(A). A State of Illinois Department of Human Services Form dated February 28, 2002 states that Jeras "meets listing 1.04(A)." (R. 173). It is unclear who filled out the form and whether the person had medical training. In any case, the issue is not whether Jeras met the listing requirements on February 28, 2002 but, rather, whether he met the listing requirement in September 1999. Even if the document were dated September 1999, it would not be enough to reverse the ALJ's decision. *See Scheck*, 357 F.3d at 698 (If the ALJ's decision is supported by substantial evidence, it "will be upheld even if an alternative position is also supported by substantial evidence."). The ALJ's conclusion that Jeras's impairment did not meet the requirements of the listing is supported by substantial evidence. Nothing in the record establishes a diagnosis of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis. Rather than an "inability to ambulate," the record shows that Jeras could walk one to two miles during the relevant time period. (R. 129, 137, 195).

In addition, Jeras argues that the ALJ should have given more weight to a functional capacity questionnaire that Dr. Pozen, one of Jeras's physicians, filled out in August 2002. The Court disagrees. Once again, this is a report filled out three years after the relevant time period. On the form, Dr. Pozen was asked about Jeras's symptoms in the present tense. (R. 178-181). At the end of the form, Dr. Pozen was asked, "What is the earliest date that the descriptions of *symptoms and limitations* in this questionnaire applies?" (R. 181) (emphasis in original). Although Dr. Pozen answered, "fall of 1998," it is impossible to tell from the form *which* symptoms applied in fall of 1998 and which applied later. Dr. Pozen's earlier records, moreover, support the ALJ's conclusions about Jeras's abilities. Dr. Pozen's January 2000 notes, for

example, reflect that Jeras told Dr. Pozen that he could stand for three hours and walk a mile. (R. 195). When Jeras next saw Dr. Pozen (in October 2000), he told Dr. Pozen that he walked one to two miles per day and was considering moving to Texas to accept a job. (R. 192). For these reasons, the Court cannot conclude that the ALJ erred by relying on Dr. Pozen's records from the relevant time period and not the functional capacity evaluation he filled out three years later.

Jeras also argues that the ALJ improperly discredited his testimony without making the credibility determinations required in Social Security Ruling 96-7p. The Seventh Circuit has explained that credibility determinations are granted "considerable deference" and overturned "[o]nly if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). Pursuant to SSR 96-7p, a credibility determination must contain specific reasons for the finding and must be based on the entire record. Jeras argues that the ALJ did not properly explain his credibility determination. The ALJ, however, explained that Jeras's testimony was inconsistent with Jeras's *own* statements to Dr. Pozen. (R. 26). This Court agrees with the ALJ. While Jeras testified in September 2002 of his then-current symptoms (which included an inability to sit or stand for more than an hour and an inability to walk more than a block), that testimony was no consistent with Jeras's earlier statements about his condition. For example, the record reflects that Jeras repeatedly told his doctors in early 2000 that he walked one to two miles per day. (R. 129, 134, 137, 195). Jeras also repeatedly told his doctors that he could stand several hours per day. (R. 129, 134, 137, 195). Accordingly, the credibility determination was properly supported. Even were it not, the error would be harmless because at the hearing, Jeras was

testifying about his condition as of September 2002, which was not relevant to the question of his condition three years earlier.

In addition, Jeras argues that the ALJ failed to consider the full effect of his alleged anxiety and depression. The Court disagrees. Substantial evidence supports the ALJ's conclusion that anxiety and depression were not severe as of Jeras's insured date (September 30, 1999). No record evidence suggests that Jeras suffered severe anxiety in or before September 1999. Much record evidence suggests that Jeras did not. In April 2000, Jeras informed the SSA that he did not believe his anxiety was disabling. (R. 88). In May 2000, Dr. Tomassetti conducted a psychological evaluation of Jeras and concluded that he did not suffer a severe psychological impairment. (R. 147-155). The record evidence makes clear that it was not until at least March 2002 that Jeras suffered more severe anxiety. (R. 174). Jeras's testimony at the hearing in September 2002 was about his symptoms as of that date, not his symptoms in September 1999. ( R. 219, 220). Accordingly, substantial evidence supports the ALJ's conclusion that Jeras did not suffer severe anxiety as of September 30, 1999.

Finally, Jeras argues that the ALJ should have given more weight to the effect of other factors, namely Jeras's alleged obesity and the side-effects of his medication, when considering his limitations. The Court disagrees. Jeras argues that the ALJ should have considered the effect of Jeras's obesity because his weight as of the hearing was 225 pounds, giving him a body-mass index ("BMI") of 30.5, which is .5 above the BMI considered Level I obesity. *See* SSR 02-1p. Jeras's weight as of September 1999, however, was not 225 pounds. As of January 2000 (the record closest in time to the relevant date), Jeras's weight was 200 pounds. (R. 76). Furthermore, nowhere in the record does a medical professional state that Jeras had a weight problem or that obesity was affecting his back. Accordingly, the ALJ did not err in failing to

-18-

consider obesity as a factor. Similarly, nothing in the record suggests that the ALJ should have considered the side-effects of Jeras's prescription drugs. When asked about drug side-effects in January 2000, Jeras reported none. (R. 82, 129). By December 2000, Jeras was again asked about the side effects of his medications. (R. 96). Jeras stated that three of his five medications had no side effects and that two produced "minimal sleepiness." (R. 96). The only other record evidence of side effects was Jeras's September 2002 hearing testimony that his medications made him feel foggy and not sharp. (R. 224). But, again, the effects in September 2002 are irrelevant. Given that the evidence with respect to the relevant time period suggested little or no side effects, the ALJ did not err.

*Whether Jeras can perform his prior work*

With respect to step four, the ALJ concluded that Jeras could not return to his previous work. (R. 26-27). This was based on the vocational expert's testimony that Jeras's previous positions were more strenuous than light work. (R. 27). The ALJ had also concluded that Jeras could not perform work that was more strenuous than light work. Accordingly, substantial evidence supports the ALJ's conclusion (which neither party challenges).

*Whether Jeras can perform other work*

At step five, the ALJ concluded that Jeras is "capable of making a successful adjustment to work that exists in significant numbers in the national economy." (R. 28). The ALJ based this conclusion on the testimony of a vocational expert. After concluding that Jeras could not return to his previous work, the ALJ asked the vocational expert whether Jeras had any transferable skills. The vocational expert testified that Jeras's skills included the ability to perform a variety of duties, the ability to obtain precise limits and standards, and the ability to make judgments and decisions. (R. 236). The ALJ next asked the vocational expert whether a person with Jeras's limitations and abilities (which, as explained above, were supported by

-19-

substantial evidence) could perform any work. The ALJ outlined several jobs (including production line assembly, quality control and bench hand light assembly work) that someone with Jeras's skills, limitations and abilities could perform. (R. 237). According to the vocational expert, at least 50,000 such jobs were available during the relevant time period. (R. 237). Accordingly, substantial evidence supports the ALJ's conclusion that Jeras could perform work in the national economy.

The final decision of the Commissioner of the Social Security Administration is supported by substantial evidence.

## IV. Conclusion

For the reasons set forth above, the Court denies plaintiff's motion for judgment and grants defendant's motion for judgment.

ENTER:

*George M. Marovich*

George M. Marovich
United States District Judge

DATED: November 13, 2006